## DUNN *et al.,* commissioners, *v.* BECK.

1. In the administration of county affairs county commissioners are vested by law with a broad discretion, and the reviewing power of a judge of the superior court should be exercised with caution, and no interference had unless it is clear and manifest that the county authorities are abusing the discretion vested in them by law. In the instant case such abuse of discretion by them was not made to appear, and the court erred in enjoining the erection of the court-house as proposed by the county commissioners.

2. In order for one house to be used for comparison with another for the purpose of illustrating its comfortableness or uncomfortableness on account of the heat and glare of the sun, the conditions must be substantially similar.

SEPTEMBER 22, 1915.

Injunction. Before Judge Fite. Murray superior court. June 15, 1915.

The County of Murray had no court-house at Chatsworth, its newly established county-seat. A land company donated to the county a lot of land in the form of a square, upon which a court-house was to be built. The county commissioners employed an architect to draw plans for the contemplated building. The architect and the county commissioners selected a site for it on the eastern side of the lot, and midway between its northern and southern extremities. It was about a quarter of a mile from the railroad-track, and elevated above the track and the business houses of the town. The building was to face the east, overlooking the railroad and business section of the town, and affording a view of the mountain ridge beyond them. The ground sloped towards the railroad, and also from the north to the south side. The building was to be two stories in height, except that at the south end it was to be three stories. Its dimensions were 81 feet and eight inches by 45 feet, and the long side of the building fronted east. A large portico, the roof of which extended to the top story of the building, was to adorn the eastern front. The top floor of the building was to be divided into a grand-jury room, a judge's chambers, and

a solicitor's room on the northern end, and petit-jury rooms on the southern end, with a court-room 45 feet square in the middle. The judge's bench was designed to be located on the south end of the court-room, adjacent to the petit-jury rooms. A contract was let, and the contractors were proceeding to erect the building according to the plans and specifications, when a taxpayer of the county filed a petition to enjoin its erection. The material paragraphs of his petition are as follows: "6. The said contractors are preparing and will build said court-house on the side of said elevation with a side front, fronting east, with the judge's stand in the south end of said building, facing north." "7. That to build said house in this manner would destroy its beauty and expose its occupants to the heat and glare of the sun almost the entire day." "8. That said house should be constructed with end to front east and with a north and south exposure, with the judge's stand in the west end of said building, front east so as to avoid the heat and glare of the morning and evening sun and get the north and south breezes for the comfort of the people." "9. That to build said house as now planned would impose upon the taxpayers and citizens of said county an irreparable damage and destroy the scenic beauty of said court-house, and render it impossible to hold court in said house without great inconvenience and discomfort." A rule nisi was granted by the court, calling upon the defendants to show cause why the prayers of petitioner should not be granted, and until the hearing the defendants were enjoined as prayed, "provided that nothing herein shall be so construed as to enjoin the defendants from constructing and building said court-house as set out in paragraph eight of the within petition." On the hearing the petition was amended by alleging that if the court-house should be built as proposed, the east side of the court-room would face the L. & N. Railroad, and the noise incident to the running of the engines and cars would greatly disturb the court in the transaction of its business; but if built as the plaintiff contends it should be, the noise of the railroad would not interfere with or disturb the court. The defendants filed demurrers both general and special; and also filed an answer in which they minutely described the building to be erected and its location. They averred, that they employed a competent architect to locate, plan, and arrange the court-house, and were proceeding to build in accordance with his

plans; that the court-house is well located on the lot, and the plans were prepared after mature consideration of the lot and all the surroundings; that in the location of the building they took into consideration the various offices in the building and the uses to which they would be put, the convenience and comfort of the people having business with the officials of the county in the court-house, as well as those attending upon the courts, and that of the judge who might preside; and that the court-room is to be well ventilated, and the people of the county will not be subjected to any discomfort in attending upon the court. The plaintiff introduced the following affidavit, signed by eleven affiants: "Deponents are well acquainted with the location, situation, and plan of the court-house at Spring Place; that said court-house is situated north and south without a northern or southern exposure; that the heat and glare of the sun was a great discomfort to the people, and, being cut off from the north and south breezes, the court was held there under conditions of great discomfort and inconvenience to the judge, attorneys, juries, and other persons attending court in said building. They further depose that to construct a new court-house at Chatsworth so as to be exposed to noise of passing trains, without a north and south exposure, and to be exposed to the heat and glare of the sun, would be a great detriment to Murray County and discomfort to the people." Petitioner also read the joint affidavit of other witnesses, that they were "well acquainted with the situation of the court-house at Spring Place, Georgia, and that the same is built and constructed fronting south; that in the forenoon and until eleven o'clock the heat and glare of the sun came in the east side of the building, and that in the afternoon from one o'clock until sundown the heat and glare of the sun is almost unbearable. The lights in said building are from the east and the west side of said building, which lets in the sun in the morning and evening." This latter affidavit was allowed in evidence over the objection of irrelevancy. The petitioner also introduced in evidence the recommendation of the grand jury at the February term, 1915, that "said court-house be placed in the center of the court-house square, facing the east." The verified petition was also introduced in evidence. The defendants insisted upon their demurrers, and read as evidence their verified answer. They introduced Alexander Blair, who testified: that he was an architect with

an experience of twenty years, during which time he had designed and built seven or eight court-houses in Georgia, and had an extensive experience in planning other buildings; that he prepared the plans and specifications of the new court-house in Murray County. Before making the plans he went to Chatsworth, carefully examined the court-house lot, and drew the plans and specifications as in his opinion would give the best results. He did not take into consideration the heat and glare of the sun. The railroad is so far distant that the noise of trains would not cause any appreciable interference with the court's business. The building is advantageously located on the lot, for the reason that in locating it in this way expense of excavation is practically avoided. The building is well ventilated. Had the building been located on the top of the hill and from east to west, as insisted by petitioner, it would have necessitated a considerable amount of excavation and grading, if there is to be a basement story, all of which is expensive, and would have made the building more expensive. The balcony would largely protect the court-room from the sun in the forenoon, and provision could be made for protecting it from the sun in the afternoon by awnings or shades or something of that sort, though there is nothing of the sort in the present plan as an item of furnishing the court-house. The witness does not regard this as a material consideration. It would be possible to change the plans so as to build the court-house on the top of the hill, as petitioner desired, and to change its location and give it a different front, so as to avoid the heat and glare of the sun in the court-room in the morning and evening.

The court continued the restraining order; and further ordered, that if the defendants decide to erect the court-house as provided for in the temporary injunction, "they may make such changes, leaving off the basement story and the columns on the side, and putting them on the east end thereof, as they may think best, and as to them may seem just and right to the architect, contractor, and the people of Murray county, without advertising for bids therefor, provided such changes be made and the court-house erected within the contract price as heretofore made." Exception is taken to this order.

*D. W. Blair* and *Jesse M. Sellers,* for plaintiffs in error.

*J. J. Bates,* contra.

EVANS, P. J. (After stating the foregoing facts.) · There is no contention of lack of authority on the part of the county commissioners to build the court-house on the lot donated by the land company. There is no attack on the contract as not having been properly awarded to the contractor according to the plans and specifications of the architect. The sole point of difference is, that the complaining taxpayer is of the opinion that the building should be located in the center of the lot, and should front north or south rather than east. Therefore the sole question to be determined is, whether the county commissioners abused their discretion in selecting the site for the erection of the court-house on the eastern side of the lot, instead of locating it in the middle thereof, and providing for an eastern instead of a northern or southern front of the building. There is hardly a proposition of any moment to be settled by county authorities but that they are called upon to act on data from which diverse conclusions may be reached. Not infrequently the citizens of the county differ as to the course to be pursued. It is impossible, in our complex civilization, to prescribe the exact manner in which every official act must be performed. Hence the manner of doing an act within the power of governing officials of a county must be largely left to their discretion. That discretion must be, from the nature of the case, a broad one, and the reviewing power of the judge of the superior court must be exercised with caution, and no interference had unless it is clear and manifest that the county authorities are abusing the discretion vested in them by law. *Comm'rs* v. *Porter Mfg. Co.,* 103 *Ga.* 613 (30 S. E. 547). This principle was recognized and applied in the case of *Dyer* v. *Martin,* 132 *Ga.* 445 (64 S. E. 475). In that case the County of Hall owned two tracts of land, upon one of which was established the farm and buildings devoted to the care of the county's poor. The commissioners determined that it was to the best interest of the county that the tract upon which the pauper farm was located be sold, and a new home for the paupers established on the other tract. At the instance of certain taxpayers the county commissioners were enjoined from making the contemplated change. This court held that the grant of the injunction was an abuse of discretion on the part of the judge of the superior court. In the course of the opinion it was said: "When the commissioners ordered the sale of the pauper farm, they exercised an

administrative act; and the courts have no authority to inquire into the expediency of their action, unless it is made to appear that they either exceeded their powers under the law, or in the exercise of that power there was a manifest abuse of discretion. When their action within the scope of the powers conferred on them by law is sought to be restrained by a complaining taxpayer, the question is, not whether the court or other taxpayers may have honestly differed with the commissioners as to the wisdom of their course, but whether that course of action is so palpably against the best interests of the county as to amount to an abuse of their discretion. We are aware that a judge of the superior court in passing upon an application for interlocutory injunction is also vested with a discretion, and this court has repeatedly held that his discretion upon the facts will not be disturbed unless it is abused. But it must be borne in mind that a court of equity will not interfere with the administrative action of the governing officials of a county within the scope of the powers delegated to them by the law, unless the act complained of is arbitrary, and amounts to an abuse of discretion."

One ground of complaint of the taxpayer as to the location of the court-house is that it would destroy its "scenic beauty." People differ largely in their tastes and their conception of the beautiful. It surely can not be said that an abuse of discretion is shown where the complaining taxpayer differed with the county commissioners and the architect upon a purely æsthetic preference. Another objection to the location is that it would be somewhat further from the railroad, if the site were selected in the middle of the lot, and therefore the sessions of the court would be less liable to disturbance by the operation of a train of cars. It is undisputed that the lot is distant about a quarter of a mile from the railroad. The character and frequency of the noises made by the trains are not disclosed, and, upon such uncertain information, it can not be said that the county commissioners abused their discretion on this account. And, lastly, the complaining taxpayer contends that, on account of the windows being located on the east and west sides of the court-room, the glare and heat of the sun will render the court-room so uncomfortable as to interfere with the transaction of the court's business. There will be a broad portico on the east front, extending practically the whole length of the

court-room, which the testimony discloses affords protection from the sun during the larger part of the morning. The evidence also discloses that the sun could be excluded from the court-room by means of shades, blinds, or awnings. It is true that the present contract does not provide for awnings or shades, but these are matters of minor detail as compared with the cost of the expensive building proposed to be erected. According to the evidence, the height of the ceiling in the court-room is 26 feet, and the commissioners in their answer affirm that the court-room will be comfortable and well adapted for the transaction of business, and that no one will suffer any inconvenience or discomfort on account of the glare of the sun. It occurs to us that this is matter of detail on which people may differ. Sometimes, in the selection of residences, one person prefers a western and another an eastern exposure; still others prefer a northern or southern exposure. It can not be said that a building with an eastern exposure is unsuited to the location of a court-room. It was also in evidence that the topography of the lot and the location of the building with reference to the town, and other considerations, entered into the propriety of the construction of the building, with an eastern front, on that particular place. The selected site provided for a basement with very little excavation, whereas, if the house were constructed in the middle of the lot, the excavation necessary for its construction would be very expensive. The county commissioners considered the various matters and contingencies which entered into the desirability of the location of the court-house, and its construction with an eastern front; and we do not think the testimony discloses such an abuse of discretion as would authorize the judge of the superior court to enjoin the construction of the court-house as proposed.

Certain witnesses deposed that the court-house at Spring Place, the former county seat of Murray County, was without a northern and southern exposure, and that the heat of the sun rendered the court-room very uncomfortable for the citizens. The judge, in ruling upon the testimony, said that he allowed it on the ground that the court-house in Spring Place was similarly situated as that proposed. The size of the building, the height of the ceilings, whether it was provided with a wide portico, the topography of the country, and various other matters which would necessarily enter into the comparison were not given. Manifestly the new

building could not be compared with the old one, unless it affirmatively appeared that the conditions were similar. This was not made to appear in this case, and the court should have rejected that testimony.

*Judgment reversed.　All the Justices concur, except Fish, C. J., absent.*